**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **THE HARTFORD FIRE INSURANCE COMPANY** | * * * |
| Plaintiff and Counter-Defendant | * * |
| v. | *  Civ. No. **PJM 16-769** * |
| **THE HARBORVIEW MARINA & YACHT CLUB COMMUNITY ASSOCIATION, INC.** | * * * * |
| Defendant and Counter-Claimant | * |

## MEMORANDUM OPINION

Plaintiff and Counter-Defendant The Hartford Fire Insurance Company (the "Hartford") and Defendant and Counter-Claimant The Harborview Marina & Yacht Club Community Association, Inc. ("Harborview") are in a dispute over the collapse of a pier in Baltimore owned by Harborview and insured by the Hartford. In its Complaint, the Hartford seeks a declaratory judgment in admiralty to the effect that (1) there is no coverage for the collapse of the pier under the relevant policy, (2) Harborview's claim is not covered for want of fortuity, (3) coverage is precluded because Harborview breached the Conditions of Coverage under the policy, and (4) coverage under the policy is void and unenforceable. Harborview counterclaims that the Hartford breached the insurance contract and failed to act in good faith when it denied coverage under the policy.[1]

The Hartford argues that the Court has jurisdiction over the dispute based on both admiralty jurisdiction and diversity jurisdiction. In its Motion for Partial Dismissal for Lack of

---

[1] Harborview originally sought a preliminary injunction requiring the Hartford to maintain the policy at current rates until the instant dispute was resolved. However, the parties have stipulated to dismissal of this counterclaim. *See* Stip. Of Dism., ECF No. 21.

-1-

Subject Matter Jurisdiction (ECF No. 6), Harborview asks that the Court dismiss any claim based on admiralty jurisdiction and that it proceed solely pursuant to diversity jurisdiction.

On July 18, 2016, the Court held a motions hearing on Harborview's Motion. For the following reasons, the Motion will be **GRANTED**.

## I. FACTS [2]

In 2014, the Hartford, an insurance company, through its broker Insurance, Inc. approached Harborview about purchasing insurance coverage for Harborview's docks and piers at Harborview Drive, Baltimore, Maryland. Compl. ¶ 8, ECF No. 1. Harborview was looking to insure a number of its piers, including one that began beyond the eastern side of the building at Pierside Drive and extended into the Baltimore harbor. *Id.* ¶ 9. To that end, Harborview obtained a "Marina Operators Legal Liability and Boat Dealer Policy," Policy No. 30 ML HS9073 (the "Policy"), effective June 26, 2014 to June 26, 2015 providing aggregate combined coverage of $5.1 million. Compl., Ex. 1, ECF No. 1-1. The Policy provided Harborview with two types of coverage: (1) "Coverage D – Floating Docks, Piers," amended to include "all docks or piers that are owned by Insured and scheduled on the Declarations page of [the] [P]olicy;" and (2) coverage against "certified acts of terrorism." *Id*. As part of Coverage D, the Policy covered "all risks of physical loss or damage except as may be [] excluded," as well as "salvage charges." *Id*.

The Policy's Schedule of Property[3] lists piers, roadways, walkways, benches, flag poles, pool equipment, and furniture, among other non-marine components. *Id.* The parties do not

---

[2] The majority of the facts are as alleged in the Complaint or the exhibit attached to the Complaint. *See* Fed. R. Civ. P. 10(c). However, the Court also considers facts drawn from documents attached to Harborview's Motion to Dismiss which are integral to the Complaint and the authenticity of which is not disputed. *See Sec'y of State For Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citing *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006)).
[3] The Hartford attached to its Complaint an incomplete copy of the Policy. *See* Compl., Ex. 1, ECF No. 1-1. In its Reply to its own Motion for Partial Dismissal, Harborview attached the Policy's pretermitted Schedule of Property. *See* Def.'s Rep. to Mot. Dismiss ("Def.'s Rep."), Ex. 2, ECF No. 18-2. The

dispute that the insured property consists solely of Harborview's fixed docks and piers, and does not include any floating docks, floating piers, or vessels docked at Harborview's property.[4] Nor do the parties dispute that prior to the collapse, the Baltimore Water Taxi (the "Water Taxi") called at the pier and used it as appoint of embarkation.[5] Plf.'s Resp. Opp'n ("Plf.'s Resp."), Ex. B, ECF No. 15-B.

According to the Hartford, when Harborview applied for insurance, the pier was in a state of advanced deterioration, and was inherently defective in design and/or construction. Compl. ¶ 10. Despite these deficiencies, says the Hartford, Harborview represented to it that the pier was of substantially newer construction, reconstruction, or refurbishment and in substantially new, or as good as new condition. *Id*. ¶ 11. According to the Harford, Harborview never disclosed the true condition of the pier. *Id*. ¶ 12.

---

Hartford does not dispute the authenticity of this Schedule of Property, and of course, the list of components of Harborview's property actually covered by the Policy is central to the Hartford's claims. Further, Federal Rule of Evidence 106's "embodiment of the evidentiary rule of completeness seeks to avoid the 'misleading impression created by taking matters out of context' (*see* 1972 Advisory Committee Note to Evid.Rule 106). It is no less important to insist on a complete picture in ruling on the current motion to dismiss than to do so on a motion to admit evidence at trial." *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 923 (N.D. Ill. 1999). *See also Beke v. Amica Gen. Agency Inc.*, 2014 WL 6066122, at *3 (N.D. Ind. Nov. 10, 2014) ("It is important to note that under the 'rule of completeness,' which is partially codified in Fed.R.Evid. 106, an adverse party is permitted to introduce other parts of a document or other documents 'which ought in fairness to be considered contemporaneously with [another document] . . . without converting a motion to dismiss into a motion for summary judgment.").

[4] At the hearing on the instant Motion, the Hartford stated, "… we are going to withdraw any suggestion that the marina itself or any floating docks are part of the risk here. . . . We will just assume and agree that the covered risk here is [just] the pier . . . ." *See* H'rg, ECF No. 23.

[5] The Hartford did not plead facts about the Water Taxi in its Complaint. Rather, it detailed the importance of the Water Taxi in its Response in Opposition to Harborview's Motion for Partial Dismissal for Lack of Subject Matter Jurisdiction. *See* Plf.'s Resp., pp. 7–8. The fact that it came in this form does not affect the assertion of fact because the Hartford could have always amended its Complaint to include facts about the Water Taxi. The other point worth observing is that Harborview, in its Reply, has submitted an affidavit suggesting that it does not own the Water Taxi, a fact that the Hartford does not dispute. Def.'s Rep., Ex. 1, ECF No. 18-1. Assuming that the Hartford's allegation about the Water Taxi could even be considered in connection with Harborview's Motion for Partial Dismissal, the question is what effect it has. And the Court will show that it would not impact the Court's determination because regardless of where the Water Taxi embarked from and who owned the Water Taxi, the fact remains that its operation was not covered by the Policy. Rep., Ex. 2, ECF No. 18-2.

On November 22, 2014, the pier failed. *Id*. ¶ 17. Harborview subsequently made a claim for $5.1 million related to the pier's failure (the "Claim"). *Id*. ¶ 18. Pursuant to its rights under the Policy, the Hartford investigated the Claim, *id*. ¶ 19, but at the conclusion of its investigation, determined that the Claim was not covered because the pier failure was due to age, wear and tear, gradual deterioration, wasted condition, inherent vice or defective repair, *not* due to a fortuity or any covered risk. *Id*. ¶¶ 20–21. The Hartford issued a denial of coverage under the Policy. *Id*. ¶ 20.

On the basis of these facts, the Hartford, in its Complaint, seeks a declaratory judgment that (1) there is no coverage for the claim under the Policy, (2) the claim is not covered for want of fortuity, (3) Harborview breached the Conditions of Coverage under the Policy, and (4) coverage for the pier under the Policy is void and unenforceable. *Id*. ¶¶ 25, 29, 35, 38.

Harborview counterclaims, alleging breach of contract under the Policy and failure to act in good faith by an insurance company, and seeks damages in the amount of $5.1 million. *Id*. ¶¶ 41, 43, 46, 49, 51, 60. Harborview submits that prior to issuing the Policy, the Hartford failed to survey or investigate the pier and the rest of the insured property, and therefore failed to draft a policy that properly accounted for Harborview's freestanding piers. Def's. Counterclaims ¶ 12, ECF No. 10. According to Harborview, the Hartford also failed to properly or fully investigate the cause of the collapse, ignoring the role played by a third-party contractor. *Id*. ¶ 21. Harborview further submits that the Hartford reinterpreted the Policy in a way that created exclusions to coverage that did not exist at the time of the suffered loss. *Id*. ¶ 20.

## II. ANALYSIS

At this stage of the proceedings, the merits of the Hartford's claims and Harborview's counter-claims must be put on hold while the Court makes a threshold determination regarding

admiralty jurisdiction. While both parties agree that the Court has jurisdiction to hear this matter on some basis, they disagree as to what the basis of the Court's jurisdiction is. The Hartford contends that jurisdiction is based on both admiralty and diversity. Harborview argues that jurisdiction is not based on admiralty, but instead, solely on diversity. Harborview filed a Motion for Partial Dismissal for Lack of Subject Matter Jurisdiction, requesting that the Court dismiss the case from the Court's admiralty jurisdiction and proceed solely pursuant to its diversity jurisdiction.[6]

Because the parties are completely diverse and the amount in controversy exceeds $75,000, diversity jurisdiction unquestionably exists.[7] Accordingly, the Court will retain jurisdiction over the case on that basis regardless of its resolution of Harborview's motion. For purposes of this case, the potential substantive differences between admiralty and diversity jurisdiction are the availability of a jury trial and the application of federal admiralty law, such as the maritime doctrine of *uberrimae fidei*. Therefore, the Court will consider whether admiralty jurisdiction applies.

A. STANDARD OF REVIEW

Federal courts have limited subject matter jurisdiction. They "possess only the jurisdiction authorized them by the United States Constitution and by federal statute." *See*

---

[6] The doctrine of estoppel is inapplicable to a matter of subject matter jurisdiction, including admiralty jurisdiction. Simply put, threshold jurisdictional questions cannot be waived by the actions of a party. *See Long v. Silver,* 248 F.3d 309, 315 n. 3 (4th Cir. 2001) ("Waiver or estoppel principles cannot confer subject matter jurisdiction on a court that would otherwise lack it."); *Brady Dev. Co. v. Resolution Trust Corp.*, 14 F.3d 998, 1007 (4th Cir. 1994) ("The doctrines of waiver and estoppel do not apply to subject matter jurisdiction determinations."); *Sentry Select Ins. Co. v. Royal Ins. Co. of Am.*, 481 F.3d 1208, 1217 (9th Cir. 2007) ("It is inconsequential to our jurisdictional analysis whether Kelly–Ryan at one point claimed that the policy was a marine insurance policy, because even a joint stipulation cannot cure a jurisdictional defect.").

[7] Federal district courts have original jurisdiction in all civil actions where the amount in controversy exceeds $75,000 and the adverse parties are "diverse," *i.e.,* citizens of different States. 28 U.S.C. § 1332. For purposes of determining a party's citizenship, a corporation is deemed a citizen "of any state in which it is incorporated or has its principal place of business." *Ware v. Jolly Roger Rides, Inc.*, 857 F.Supp. 462, 464 (D.Md.1994).

*United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Bowles v. Russell*, 551 U.S. 205, 127 S. Ct. 2360, 168 L.Ed.2d 96 (2007)). In addition to federal question and diversity cases, federal district courts possess original jurisdiction over matters arising out of admiralty or maritime law. *See* U.S. CONST. art. III, § 2; 28 U.S.C. § 1333. *See also Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004).

When subject matter jurisdiction is challenged, the plaintiff bears the burden of proving, by a preponderance of evidence, that jurisdiction exists. *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); *Evans v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir. 1999); *see also United States ex. rel. Vuyyuru v. Jadhau,* 555 F.3d 337, 347 (4th Cir. 2009), *cert. denied,* 558 U.S. 875 (2009).

In considering whether to dismiss for lack of jurisdiction, the court may consider "evidence outside of the pleadings without converting the proceeding into one for summary judgment." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (quoting *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 768); *see also Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) ("[T]he court may consider the evidence beyond the scope of the pleadings to resolve factual disputes concerning [subject matter] jurisdiction.").

### B. JURISDICTION

The Hartford says that, in addition to diversity jurisdiction, the Court has subject matter jurisdiction by virtue of the federal courts' original jurisdiction over admiralty cases. *See* 28 U.S.C. § 1333(1). Federal courts' "authority to make decisional law for the interpretation of maritime contracts stems from the Constitution's grant of admiralty jurisdiction to federal courts." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004); *see*

U.S. Const. art. III, § 2, cl. 1 (providing that the federal judicial power "shall extend . . . to all Cases of admiralty and maritime Jurisdiction").

Admiralty jurisdiction involving an insurance policy hinges on whether the Policy is a maritime contract. *See id. See also South Carolina State Ports Authority v. Silver Anchor, S.A.*, 23 F.3d 842, 846 (4th Cir. 1994) ("When confronted with issues of admiralty jurisdiction over contracts, courts 'look to the subject matter of the contract.'") (citations omitted) (quoting *Exxon Corp. v. Central Gulf Lines*, 500 U.S. 603, 612 (1991)). However, courts acknowledge that there are few "clean lines between maritime and nonmaritime contracts," recognizing that "the boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." *Id.* at 23. This conceptual boundary is demarcated by the "fundamental interest giving rise to maritime jurisdiction"—"the protection of maritime commerce." *Exxon Corp. v. Cent. Gulf Lines, Inc.,* 500 U.S. 603, 608, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991). Accordingly, the test for determining whether a court may exercise admiralty jurisdiction over a contract is conceptually amorphous, requiring courts to resort to a case-by-case inquiry to determine whether the contract is "salty" enough to be classified as a maritime contract deserving admiralty jurisdiction. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 742, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). This approach is further complicated with regard to mixed contracts, – i.e. those contracts containing both maritime and non-maritime elements. *See New Hampshire Ins. Co. v. Home Sav. & Loan Co. of Youngstown, Ohio*, 581 F.3d 420, 424 (6th Cir. 2009).

Prior to *Norfolk Southern Railway v. Kirby*, admiralty jurisdiction was said to be limited to "contracts, claims, and services *purely* maritime," *Rea v. The Eclipse*, 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269 (1890) (emphasis added). "For admiralty jurisdiction to exist, 'the

subject contract [had to] be wholly maritime in nature, or any nonmaritime elements must [have been] either insignificant or severable." *Commercial Union Ins. Co. v. Detyens Shipyard, Inc.*, 147 F. Supp. 2d 413, 419 (D.S.C. 2001) (quoting *Wilkins v. Commercial Inv. Trust Corp.,* 153 F.3d 1273, 1276 (11th Cir.1998)) (collecting cases); *see also Outbound Maritime Corp. v. P.T. Indonesian Consortium of Constr. Indus.,* 582 F.Supp. 1136, 1142 (D.Md.1984) ("To serve as the basis of maritime jurisdiction[,] a contract must be 'purely' maritime. In mixed contracts, maritime jurisdiction may nonetheless attach if the non-maritime elements of the contract are not substantial or if they are separable from the maritime elements.").

The Supreme Court's decision in *Kirby* appeared to undermine the continuing force of the incidental and severability exceptions. *See Sentry Select Ins. Co. v. Royal Ins. Co. of Am.*, 481 F.3d 1208, 1218 (9th Cir. 2007); *Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 314 (2d Cir. 2005). The Supreme Court suggested a change in analysis, shifting the focus of the inquiry away from the non-maritime elements, and focusing instead on the substantiality of the maritime elements. *See Kirby*, 543 U.S. at 27.

In *Kirby*, the Supreme Court was faced with a mixed contract relating to bills of lading for the transportation of goods by both land and sea. *Id.* at 18–19. The dispute centered on whether these bills of lading were maritime contracts despite providing for significant land transit by rail. *Id.* at 23–24. What in fact happened was that the sea leg of the journey was successful, but the train carrying the cargo inland derailed en route. *Id*. at 18. Was it then a maritime contract? The Supreme Court concluded that even though the accident occurred during the land portion of the journey, the bills of lading were maritime contracts and fell within its admiralty jurisdiction. *Id.* at 24 (reasoning that the "bills [we]re maritime contracts because their

primary objective [was] to accomplish the transportation of goods by sea from Australia to the United States' eastern coast.").

*Kirby* held that "whether a contract is a maritime one . . . 'depends upon . . . the nature and character of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.' " *Id*. at 23–24 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.,* 249 U.S. 119, 125, 39 S.Ct. 221, 63 L.Ed. 510 (1919)). So whether a contract is a maritime contract does not depend upon "whether a ship or other vessel was involved in the dispute." [8] *Id*. at 23. Rather, a court's inquiry should focus on "whether the principal objective of a contract is maritime commerce." *Id*. at 25. Where the maritime aspects of the contract are "substantial," courts may exercise admiralty jurisdiction over any dispute that derives from that contract. *Id.* at 27. The *Kirby* analysis has become known as the "primary objective test," meaning that where the primary objective of the contract is maritime commerce, a district court can exercise admiralty jurisdiction over the dispute, even if the dispute arose out of a non-maritime incident. *See Village of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 196 (4th Cir. 2013) (quoting *Kirby*, 543 U.S. at 25) (holding that Army Corps of Engineers' alleged contracts with a North Carolina village were not "maritime contracts" because their principal objective was to protect area beaches).

While the dispute in *Kirby* centered on a mixed contract and espoused a set of rules and considerations easily applicable to multi-modal transportation contracts, the same rules and considerations do not apply as easily to mixed contracts unrelated to objective geographical

---

[8] There is a key difference between admiralty jurisdiction in contract cases and tort cases. In general, if a tort occurs on the high seas or navigable waters, any action arising out of the tort is subject to a federal court's admiralty jurisdiction. *See Kirby*, 543 U.S. at 23-24 (noting that, ordinarily, a court may simply look to whether a ship or other vessel was involved in a dispute in "putative maritime tort cas[es]"). The same rule does not apply to contract disputes. *See id.* (noting that a court cannot simply look to "the place of the contract's formation or performance" to determine if a court can exercise admiralty jurisdiction).

components. Accordingly, application of the *Kirby* approach to umbrella insurance policies that cover both maritime and non-maritime risks – such as the Policy in the instant case –led to inconsistent results among the various circuits. *See* Philip Michael Powell Esq., The Mixed Up Exercise of Admiralty Jurisdiction over Mixed Contracts, Namely Umbrella Insurance Policies Covering Shore-Side and Sea-Side Risks, 20 Ocean & Coastal L.J. 1 (2015). The Fourth Circuit, however, has yet to drop anchor on the question of whether a mixed insurance contract is a maritime contract. It is helpful, therefore to consider how other circuits have applied *Kirby* to mixed insurance contracts.

The Second Circuit engaged in a two-step process. Relying on cases decided before *Kirby*, it held that "prior to inquiring into the subject matter of the contract, [it] first [must] make a 'threshold inquiry' into the subject matter of the *dispute*."[9] *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc*. 413 F.3d 307, 312 (2d Cir. 2005).[10] Pursuant to this approach, the court "must initially determine whether the *subject matter of the dispute* is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." *Id*. (emphasis in the original) (quoting *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 200 (2d Cir. 1992)). *See also Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 634 (2d Cir. 2016).[11] Next, the Second Circuit considered the

---

[9] The Second Circuit acknowledged that "some uncertainty [exists] as to the extent to which [its] 'threshold inquiry' test survives [*Kirby*]." *Folksamerica*, 413 F.3d at 313–14 ("[T]he absence of any discussion by the Supreme Court [in *Kirby*] of a 'threshold inquiry' akin to that found in our precedents is notable.").

[10] In *Folksamerica*, the Second Circuit considered a Comprehensive General Liability ("CGL") policy, which included a Shiprepairers Legal Liability policy providing umbrella coverage for a ship tank cleaning business's operations. *Id*. at 309–10. The suit arose after a subcontractor's employee suffered an injury. *Id.*

[11] At issue in *Fireman's Fund* were two insurance policies – a pollution policy and an excess property insurance policy – covering a dry dock owned by a marine construction firm. *Id*. at 625–26. When the dry dock sunk, the insurers argued that the policies did not cover the costs of removing the dry dock and cleaning up the site. *Id*. at 629.

subject matter of the contract as a whole, focusing on the scope of the actual coverage and the risk assumed by the insurer under the policy. *See id.* at 315 ("[A]dmiralty jurisdiction will exist over an insurance contract where the primary or principal objective of the contract is the establishment of 'policies of marine insurance.'"). According to the Second Circuit, "whether an insurance policy is marine insurance depends on whether the insurer assumes risks which are marine risks." *Id.* at 316. This analysis "requires consideration of 'the terms of the insurance contract and the nature of the business insured.'" *Fireman's Fund*, 822 F.3d at 636 (quoting *Folksamerica*, 413 F.3d at 317). "[A]n insurance policy's predominant purpose, as measured by the dimensions of the contingency insured against and the risk assumed, determines the nature of the insurance." *Folksamerica*, 413 F.3d at 317 (quoting *Acadia Ins. Co. v. McNeil,* 116 F.3d 599, 603 (1st Cir.1997)).

The Sixth Circuit, unlike the Second Circuit, did not engage in a "threshold inquiry."[12] *See New Hampshire Ins. Co. v. Home Sav. & Loan Co. of Youngstown, Ohio*, 581 F.3d 420, 425 (6th Cir. 2009).[13] Instead, the Sixth Circuit considered the "interests insured" to determine if the policy was enough of a maritime contract to justify admiralty jurisdiction. *Id.* at 427. "Looking at the 'interests insured' by the policy *sub judice,* [the court] concluded that the weight of authority indicates that this insurance policy [was] not a maritime contract because its 'primary objective'

---

[12] The Sixth Circuit indicated that it had "serious reservations as to whether the focus of this 'threshold inquiry' can be squared with controlling Supreme Court precedent. Most importantly, the Supreme Court has never endorsed an inquiry into the subject matter of the dispute, despite its long history of dealing with precisely the types of claims at issue here." *New Hampshire*, 581 F.3d at 425.

[13] In *New Hampshire*, the policy at issue covered a yacht dealer and marina operator for both Yacht Dealer Operations and Marina Operations. *New* Hampshire, 581 F.3d at 422. The policy included loss or damage to inventory, damage to third-party property while in custody, personal injury or property damage occurring on its boats or at its marina, and loss or damage to its tools or equipment. *Id.* The policy did, however, explicitly exclude coverage for "owned watercraft." *Id*. at 424. Included in the policy was Truth in Lending Errors and Omissions Liability Coverage, and the company invoked this part of the policy after two banks sued alleging the dealership made fraudulent misrepresentations and failed to deliver boats with clean title. *Id.* at 422.

does not relate to 'maritime commerce.'" *Id*. Concluding that "insurance covering marina operations are not necessarily maritime contracts," *id.* at 428, the Sixth Circuit relied on the Ninth Circuit's pre-*Kirby* opinion in *Royal Ins. Co. v. Pier 39 Ltd. P'ship*, which suggested that "contracts associated with fixed structures rather than a specific vessel generally are not maritime contracts." *Id*. at 429–30 (highlighting that the policy expressly excluded "owned water craft" from coverage"). The Sixth Circuit described a "conceptual distinction between a contract relating to a particular vessel involved in a commercial operation as opposed to the overarching operation of a fixed structure that happens to involve boats." *Id.* at 431 ("Simply because a contract involves a marina does not mean it necessarily is a maritime contract. We must look at the nature of the contract and, in the case of an insurance policy, consider the specific interests insured."). Accordingly, the court concluded that the insurance contract fell outside its admiralty jurisdiction, "despite the fact that some of the services provided by the marina may [have] relate[d] incidentally to or facilitate maritime commerce." *Id*.

The Fifth Circuit examined both the terms of coverage and the interests insured to determine if the primary objective of the contract was maritime commerce. *See St. Paul Fire & Marine Ins. Co. v. Bd. of Comm'rs of Port of New Orleans*, 418 F. App'x 305 (5th Cir. 2011).[14] First, the court considered the primary objective of the type of insurance policy at issue. *Id.* at 308 (stating that the types of policies at issue "[we]re widely recognized as common marine insurance policies"). Then, the Fifth Circuit scrutinized the "functioning and purpose" of the interests insured by the contract to identify whether "the conceptual focus of the policy [was] maritime commerce." *Id*. The court considered all interests insured under the contract, including

---

[14] *St. Paul Fire* centered on a port's "bumbershoot" policy (i.e., an umbrella policy) that provided excess coverage for liabilities that exceeded certain underlying policies, and filled the liability gaps in those underlying policies. *St. Paul Fire*, 418 F. App'x at 308. The dispute arose after a port worker was injured on the job. *St. Paul Fire & Marine Ins. Co. v. Bd. of Comm'rs of Port of New Orleans*, 646 F. Supp. 2d 813, 816 (E.D. La. 2009).

the port and the vessels specifically covered in the policy.[15] *Id.* ("The Port is specifically charged with the statutory duty to 'regulate the commerce and traffic of the port and harbor of New Orleans'. . . . The Port also owns and operates fourteen vessels to carry out its charge, and these vessels are specifically covered in the bumbershoot policy."). Even though the port was partially land-based and the policy provided coverage for some land-based operations, the Fifth Circuit found that the policy remained inextricably related to maritime commerce. *Id.* Additionally, the Fifth Circuit took into account the type of policy at issue, stating that "bumbershoot policies are widely recognized as common marine insurance policies." *Id.* at 308.

The Ninth Circuit has characterized *Kirby's* "primary objective" test as one that "examined the contract as a whole to determine whether its primary purpose was to protect or affect maritime commerce." *Sentry Select Ins. Co. v. Royal Ins. Co. of Am.*, 481 F.3d 1208, 1219 (9th Cir. 2007).[16] The court asked whether the sea components of the policy could be labeled as "substantial" and whether the policy possessed the "genuinely salty flavor" of a marine insurance contract. *Id.* at 1220 (citing *Kirby*, 543 U.S. at 22, 27). The Ninth Circuit concluded that "[n]either the primary interests insured nor the principal risks insured against in the [policy] . . . [was] fundamentally maritime in nature." *Id.* at 1220. The principal purpose of the policy, it found, was to provide umbrella coverage in excess of the party's other "shore-side" insurance

---

[15] According to the Fifth Circuit, the inclusion of these vessels within the policy's coverage "differentiate[d] the instant case from cases holding there was no admiralty jurisdiction over a land-based insured operating a dock or shipyard where the policy expressly excluded vessel coverage. *See, e.g., New Hampshire Ins. Co. v. Home Savings & Loan Co.,* 581 F.3d 420, 428–29 (6th Cir.2009)." *St. Paul Fire*, 418 F. App'x at 308.

[16] The Ninth Circuit in *Sentry Select* dealt with a Marine Coverage Endorsement ("MEL") to a Commercial Catastrophe Liability Insurance Policy that provided excess/umbrella coverage for a construction company. *See Sentry* Select, 481 F. 3d at 1212. The MEL endorsement extended coverage for bodily injuries suffered while painting or scraping decks of tugs or barges, and loading and unloading the barges. *Id.* at 1213. The construction company was in the business of shipping (by barge) and installing prefabricated houses. *Id.* at 1211. The litigation arose when an employee was electrocuted while on shore in the midst of the delivery of a house. *Id.* at 1212.

policies, not to protect its maritime commerce operations. *Id.* at 1219. The court noted that the policy excluded traditional marine risks and only provided coverage for one component – a Maritime Employer's Liability ("MEL") endorsement – related to maritime commerce. *Id*. And even the MEL endorsement was "confided to [] typical shore-side activities." *Id*. "Moreover, the linkage between the [policy] and maritime commerce [was] too tenuous to justify classifying the insurance as a maritime obligation or interest sufficient to bring the policies within the pale of admiralty jurisdiction." *Id*. at 1220 (ellipses omitted) (quoting *Simon v. Intercontinental Transp. (ICT) B.V.*, 882 F.2d 1435, 1443 (9th Cir. 1989)).

From this mix of opinions, four potential considerations emerge: (1) the nature of the dispute; (2) the type or form of the policy at issue; (3) the scope of the policy's coverage; and (4) the interests insured by the policy.

The Second Circuit, through its "threshold inquiry," is the only court that has considered the nature of the dispute itself. The Fourth Circuit has never conducted such a "threshold inquiry" and "the Supreme Court has never endorsed an inquiry into the subject matter of the dispute, despite its long history of dealing with precisely the types of claims at issue here." *New Hampshire,* 581 F.3d at 425. Accordingly, the Court chooses to focus its inquiry on the Policy as a whole.[17]

The Fifth and Second Circuits implicitly disagree about whether the type of insurance policy is relevant to the admiralty jurisdiction analysis. Without reference to precedent, the Fifth Circuit "[l]ook[ed] at both the type and terms of the policy." *St. Paul Fire*, 418 Fed.Appx. at 308. In contrast, the Second Circuit took a deep dive into precedent, which "illustrate[d] that the form

---

[17] Even if applied, a "threshold inquiry" focusing on the subject matter of the dispute – i.e., whether the pier's collapse resulted from wear and tear; whether the damage resulted from a fortuity; and whether Harborview provided routine and necessary maintenance – would only buttress the Court's ultimate conclusion that it lacks admiralty jurisdiction.

of-or label given to-an insurance policy will not always identify the nature of the risks the insurer assumes." *Folksamerica*, 413 F.3d at 317 ("Neither the policy's form nor its 'marine insurance' title, therefore, is dispositive of the jurisdictional issue.").

This Court is persuaded by the Second Circuit's comprehensive analysis, and agrees with its conclusion that "coverage determines whether a policy is 'marine insurance,' and coverage is a function of the terms of the insurance contract and the nature of the business insured."

Here, the scope of the coverage provided by the Policy includes insurance against all risks of physical loss or damage, including salvage charges, as well as terrorism. Notably, the Policy does not include traditional marine risks such as insurance for property damage to boats, vessel collision insurance, coverage for maritime related operations, or pollution. *See Folksamerica*, 413 F. 3d at 318–20; *Sentry Select*, 481 F. 3d at 1219–20; *St. Paul Fire*, 418 Fed.Appx. at 307. The Hartford's argument that the coverage for salvage charges and terrorism justifies a finding of admiralty jurisdiction is all sail and no anchor. These coverages are, at best, only tangentially related to maritime commerce, and are secondary to the Policy's primary objective to insure Harborview's land-based property against property damage. "[T]he linkage between [these coverages] and maritime commerce is 'too tenuous to justify classifying the insurance as a maritime obligation or interest sufficient to bring the [Policy] within the pale of admiralty jurisdiction.'" *Sentry Select*, 481 F.3d at 1220 (ellipses omitted) (quoting *Simon v. Intercontinental Transp. (ICT) B.V.*, 882 F.2d 1435, 1443 (9th Cir. 1989)).

Indeed, the focus of the risks insured by the Policy is not at all on maritime commerce, but rather on protecting land-based property from damage. The Policy states, "The property insured hereunder is covered against all risks of physical loss or damage except as may be hereinafter excluded." The Policy has no "reference to maritime service or maritime

transactions," *Kirby*, 543 U.S. at 23–24, and the principal purpose of the Policy is not to protect Harborview's maritime commerce operations. *See Sentry Select*, 481 F.3d at 1219. The limited nature of the maritime commerce covered by the instant Policy is underscored when compared to the Comprehensive General Liability ("CGL") policy analyzed in *Folksamerica*. *See Folksamerica*, 413 F.3d at 317–23 (concluding that in examining "the various protections provided in the CGL section of the Policy—completed operations, products, pollution, premises and operations, and contractual liability—the first three are decidedly marine in nature and the fourth covers both shore side and maritime risks"). On its face, the Policy is not primarily or principally concerned with maritime objectives, and the risks assumed are not marine risks. In other words, the sea components of the Policy are decidedly insubstantial, and the Policy's scope of coverage indicates that the Policy is a non-maritime contract.

Analysis of the interests insured by the Policy further buttresses the view that the Policy is a non-maritime contract. As amended, it covers "all docks or piers that are owned by [Harborview]," and makes no mention of vessels, seamen, cargo, or freight. *C.f. Essex Ins. Co. v. Detroit Bulk Storage, Inc.*, 2012 WL 1893514, at *3 (E.D. Mich. May 23, 2012) (finding that the policy was a maritime contract because it "provide[d] insurance coverage specifically for objects of maritime commerce (i.e., watercraft, equipment, cargoes, and freights")). *See also Sisson v. Ruby,* 497 U.S. 358, 367, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990) ("The fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce.'" (quoting *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 674, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982))). Here, the Schedule of Property lists piers, roadways, planters, benches, trash receptacles, flag poles, pool equipment, fencing, furniture, and lights, among other components, none of which are inextricably maritime in nature. While it is true that Harborview's piers, walkways, and lights

are used to facilitate the docking of third parties' boats and operation of the Baltimore City's Water Taxi, none of these features of maritime commerce are insured by the Policy.

In fact, the Policy does not insure Harborview's operations at all.[18] The interests insured by the Policy are even farther removed from maritime commerce than the interests that were insured by the "Marina Operations" policy in *New Hampshire Insurance Company*, which covered, among other things, "hauling and launching of craft" and "certain operations and services with respect to 'pleasure craft . . . within a 500 mile radius of the insured's premises.'" *New Hampshire*, 581 F.3d at 423–24. *See also St. Paul Fire*, 418 Fed.Appx. at 307–08 (explaining that the policy provided "broad coverage for the Port's operations"). And in that case, the Sixth Circuit found no maritime contract. It is therefore inconsequential that "some of the services provided by the [docks and piers] may relate incidentally to or facilitate maritime commerce." *Id*. at 431.

While courts do not necessarily look "to whether a ship or other vessel was involved in the *dispute*," *Kirby*, 543 U.S. at 23 (emphasis added), since no ships or vessels are even

---

[18] It is important to distinguish between the interests included in the contract and Harborview's general operations. Although not related to an insurance policy, the Fourth Circuit's opinion in *Village of Bald Head Island* is instructive. *Vill. of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186 (4th Cir. 2013). In that case, as part of the Wilmington Harbor Project, the U.S. Army Corps of Engineers maintained a navigation channel in a river by widening and deepening the channel. In two letters, the Army Corps made commitments to a nearby village to protect adjacent beaches against adverse effects stemming from the Wilmington Harbor Project. The Fourth Circuit concluded that these letters were not maritime contracts because the "principal objective" of the contracts was not "maritime commerce," but rather the preservation of area beaches. *Id.* at 196. Although the Fourth Circuit acknowledged that the principal purpose of the Wilmington Harbor Project as a whole "was to protect maritime commerce by ensuring that vessels could continue to access the port in Wilmington, North Carolina," "the [letters]— which were negotiated in response to the project in order to limit its impact on area beaches—were not designed to protect or engage in maritime commerce. Rather, they were sought to serve the recreational and aesthetic interests of the Village, as well as the property interests of property owners in the Village." *Id.* at 196–97. Just as the Fourth Circuit considered only the specific purpose of the letters at issue, ignoring the larger context surrounding them, in the case at bar, the Court analyzes the Policy's coverage of the piers and docks to the exclusion of Harborview's general operations and any third party operations that might be facilitated by Harborview's fixed structures.

implicated in the Policy, it really lacks any "salty flavor" at all.[19] The Court recognizes the "conceptual distinction between a contract relating to a particular vessel involved in a commercial operation as opposed to the overarching operation of a fixed structure that happens to involve boats." *New Hampshire*, 581 F.3d at 431. *See also* 1 Admiralty & Mar. Law § 3-10 (5th ed.) ("The only general rule is that to be a maritime contract, the subject matter of the contract must be directly and intimately related to the operation of a vessel and navigation; it is not enough that the contract relate in some *preliminary* (shoreside) manner to maritime affairs."). The fact that the Policy does not cover vessels also distinguishes it from the policy in *St. Paul Fire & Marine Insurance* in the Fifth Circuit, which covered fourteen vessels owned by the port. *See St. Paul Fire*, 418 Fed.Appx. at 308 (stating that the policy's coverage of the vessels "differentiate[d] the instant case from cases holding there was no admiralty jurisdiction over a land-based insured operating a dock or shipyard where the policy expressly excluded vessel coverage").

While it has been said that "marine insurance contracts are usually maritime contracts as a matter of law," *see Flame S.A. v. Freight Bulk Pte.*, Ltd., 762 F.3d 352, 362 (4th Cir. 2014), Harborview's Policy is quite simply not a marine insurance contract. It is instead, an insurance policy for land-based property bearing at most a tangential relationship to marine commerce. *Cf. La Reunion Francaise SA v. Barnes*, 247 F.3d 1022, 1025 (9th Cir. 2001) ("[A] policy covering a

---

[19] The Hartford's assertion that the Sixth Circuit "ignored *Kirby's* instruction that maritime contract jurisdiction 'cannot' be determined by looking to the relationship with a vessel'" misreads *Kirby*. *See* Def.'s Rep., p. 14. In *Kirby*, the Supreme Court held that, "[t]o ascertain a contract's maritime nature, this Court looks not to whether a ship or vessel was involved in the dispute, . . . or to the place of the contract's formation or performance, . . . [but to] the nature and character of the contract." *Kirby*, 534 U.S. at 23. This language instructs against considering whether a vessel was involved in the dispute (i.e., the train derailment in *Kirby*), but does not rule out considering whether a vessel was implicated in the contract as a whole. The Supreme Court was merely explaining why it was irrelevant to its analysis that no ship or vessel was involved in the damage to the cargo. It was not expressing a blanket rule that courts should not consider whether a ship or vessel is implicated in the contract as a whole.

beach house against damage from the sea is not a maritime contract, but insurance for a vessel is clearly within the scope of admiralty jurisdiction."); *accord Royal Ins. Co. v. Pier 39 Ltd. P'ship*, 738 F.2d 1035, 1036 (9th Cir.1984). "Simply because a contract involves a marina does not mean it necessarily is a maritime contract." *New Hampshire*, 581 F.3d at 431. The Court instead looks at the nature of the Policy, the scope of the coverage, and the specific interests insured.

When faced with determining whether a mixed insurance contract is or is not a maritime contract, the Court must ultimately ask whether the nature and character of the Policy has reference to maritime service or transactions and whether the principal objective of the Policy is maritime commerce. *See Kirby*, 543 U.S. at 23–24. *See also New Eng. Mut. Marine Ins. Co. v. Dunham*, 78 U.S. 1, 20 (1870); *Flame S.A. v. Freight Bulk Pte. Ltd.*, 762 F.3d 352, 361 (4th Cir. 2014) ("providing that 'a contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law and the case is one of admiralty jurisdiction'") (quoting 1–XII Benedict on Admiralty § 182). Here, neither the principal risks insured against nor the primary interests insured in the Policy encompass maritime service, transactions, or commerce. The Policy's primary objective is therefore not fundamentally maritime in nature. Accordingly, the Policy is not a maritime insurance contract over which the Court may exercise admiralty jurisdiction.

### III.  CONCLUSION

For the foregoing reasons, Harborview's Motion for Partial Dismissal for Lack of Subject Matter Jurisdiction is **GRANTED**, as set forth in the accompanying Order.

_____/s/_____

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**December 9, 2016**